## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SYLVESTER ANDERSON,

        Petitioner,

      v.

WARDEN, *et al.*,

        Respondents.

No. 4:18-CV-02053

(Judge Brann)

### MEMORANDUM OPINION

### FEBRUARY 9, 2021

Petitioner Sylvester Anderson, a state prisoner presently confined at the State Correctional Institution at Mahanoy in Frackville, Pennsylvania, filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his state conviction on numerous grounds, including that a detective now under federal indictment planted the drugs he was charged with possessing.[1]  Respondents filed an answer,[2] and Petitioner has filed a letter reply and a more recent letter update regarding new evidence in support of his claims.[3]  The petition is thus ripe for disposition.  For the reasons discussed below, the Court will *sua sponte* stay the petition pending exhaustion of Petitioner's grounds for relief in state court.

---

[1]   Docs. 1 (petition), 2 (supplement to petition).

[2]   Docs. 11 (answer), 11-1 (brief).

[3]   Docs. 12, 16.

## I.      BACKGROUND

On or about March 8, 2013, Petitioner was driving his vehicle in Carlisle, Pennsylvania.  A warrant was issued for his arrest earlier that day on an unrelated charge, with Detective Christopher Collare seeking the warrant.  Petitioner was stopped that evening, a Friday, by Carlisle police officers and detectives, including Detective Collare.  Petitioner was searched, and cigarillos and cash were found in his pockets.  A visual search of the inside of his vehicle from outside revealed nothing of note.  That evening, Petitioner's car was taken to the police impound lot. Based on the large amount of cash in Petitioner's possession, Detective Collare sought a search warrant.  It was issued on Monday, March 11, 2013, and later that day, Detective Collare searched the vehicle.  On the floor of the backseat, Detective Collare discovered a knit glove in which six packets of heroin were found.  The next day, March 12, 2013, the Carlisle Borough Police Department charged Petitioner with possession with intent to deliver heroin.[4]

A jury trial was held from September 11, 2013 through September 13, 2013 in the Court of Common Pleas of Cumberland County.[5]  The prosecution's theory of the case, as outlined in the opening statement, was that the presence of large amounts of cash, which the prosecution contended was organized in such a way as

---

[4]    Doc. 11-2 (criminal complaint); Doc. 11-1 at 1.
[5]    *Id.* at 1-2.

to indicate drug dealing; the six bags of heroin; and the lack of drug paraphernalia demonstrated Petitioner's intent to distribute the heroin rather than his possession for personal use.  The defense's theory of the case, as outlined in the opening statement, was that Petitioner was living in a boarding house; that his mother had given him cash to pay his rent and get necessary dental work; that he kept it on his person because the boarding house was not secure and he did not have a bank account; and that the money was not organized in specific way that would indicate separate drug deals.  Further, the defense argued that the heroin was not Petitioner's, that it was not in the car when Petitioner was stopped on Friday evening, and that none of his fingerprints or any fingerprints were found on the glove or the heroin packets.

The prosecution put on the following testimony relevant to this petition: Corporal Timothy Groller stopped Petitioner pursuant to an arrest warrant issued that day on another matter,[6] together with Detective Collare, Sergeant Miller, Officer Sturm, Officer Klinger, Officer Rogers, and Detective Freedman.[7]  Prior to the stop, Corporal Groller was driving in a vehicle that was immediately behind Petitioner's vehicle.[8]  According to Respondent, Corporal Groller observed Petitioner make a

---

[6]  *See* Doc. 11-3 at 1.

[7]  Doc. 11-4 at 28 (jury trial transcript).

[8]  *Id.* at 29.

"furtive" movement, including turning and throwing something to the back of the vehicle; this page of testimony is missing from the trial transcript.[9]

After Petitioner exited his vehicle, he was searched by Corporal Groller and Officer Strum.[10]   They discovered cigarillos and $1,250.00 in Petitioner's right pocket.[11]   Corporal Groller testified that the money was together but "separated, different denominations of bills.  They were folded in different ways . . . . [I]t wasn't in a large wad as it is now.  It was – it was balled up in different ways."[12]   Further testimony established that such organization of cash was indicative of drug dealing.[13]   Detective Freedman separately discovered $727.00 in another pocket, which was organized similarly such that it may indicate drug dealing.[14]   No drugs or drug paraphernalia were found on Petitioner.[15]   No one searched inside the car at the time of Petitioner's arrest and search,[16] however Corporal Groller visually inspected the inside of the vehicle through the windows with his flashlight, looking for anything

---

[9]   Doc. 11-1 at 2.  It appears that this testimony would have appeared on page 39 of the trial transcript.

[10]   Doc. 11-4.

[11]   *Id.* at 31.

[12]   *Id.* at 32.

[13]   *Id.*

[14]   *Id.* at 33-34.

[15]   *Id.* at 35.

[16]   *Id.* at 36-37.

in plain view.[17]  He "looked inside the car, on the ground, all over the place."[18]  He did not observe anything in the back of the vehicle.[19]

During trial, Detective Collare was accepted as an expert in street level drug trafficking and testified accordingly.  Detective Collare explained that he was present during the traffic stop and that he observed the search of Petitioner and the seizure of money from his pockets; that he advised another officer to keep the two piles of money separate so as to not commingle them; that Corporal Groller told him of the furtive movement made by Petitioner during the traffic stop; that he was the affiant on a search warrant for Petitioner's vehicle; that Petitioner was stopped on a Friday evening and Detective Collare obtained the search warrant on Monday morning; that he personally searched the vehicle on Monday; that he observed a black knit type glove in the rear of the vehicle behind the front passenger's seat, inside of which were six packets of heroin contained within a zip lock bag.[20]  In addition, Detective Collare testified that the vehicle remained in the police's impound lot between Friday evening and the search after the warrant was obtained on Monday.[21]  He also testified that no fingerprints were found on any of those items.[22]

---

[17]  *See id.* at 41-42.
[18]  *Id.* at 42.
[19]  *Id.*
[20]  *Id.* at 78-85.
[21]  *Id.* at 84.
[22]  *Id.* at 92-93.

The defense presented the following testimony: Petitioner's mother testified that she had given Petitioner a total of $5,000 at different times during February and March 2013 so that he could get an apartment because he could not stay with her.[23] In addition, Petitioner testified in his own defense. He testified that he had a large amount of cash on him that night for his rent, for dental work to have a crown replaced, and, admittedly, to purchase drugs and alcohol. Additionally, the larger amount of approximately $1200 in one pocket was ear marked for his dental work and his apartment rent, and the smaller amount of approximately $700 was in his other pocket for drugs and alcohol.[24] It was not in individual stacks.[25] He explained that he kept money and everything else on his person because he was living with five people and things would go missing.[26] He also explained that he was previously shot ten times, and that as a result of those injuries, he became addicted to Oxycontin and then heroin.[27]

Petitioner explained that he left his boarding house around 8:00 p.m. on the evening in question so that he could get to the liquor store before closing.[28] He was pulled over on his way there.[29] He stated that the drugs later found in the car were

---

[23]  *Id.* at 135.
[24]  *Id.* at 167-68, 170.
[25]  *Id.* at 174.
[26]  *Id.* at 169-70.
[27]  *Id.* at 167, 172.
[28]  *Id.* at 167-68.
[29]  *Id.* at 168.

not his.  Petitioner and the prosecution went back and forth during cross examination

regarding the nature of his drug habit, which is not relevant to the instant petition at

this moment.    Relevant here, however, is the following colloquy between the

prosecution and Petitioner:

> Q.    So despite being a heavy heroin addict, that was not your heroin
> in the car?
>
> A.    Honest to God's truth, that was not my heroin in the car.
>
> Q.    Do you think the police planted it?  Is that your theory?
>
> A.    I can tell you this, you know, if Mr. – me and Collare know each
> other.  You know, I have no problem with Mr. Collare.  But I do
> have a problem with the – I do have a problem with the
> contradiction of how they said they found it.  I didn't know they
> said they seen me toss something until I got my discovery back.
>
> When I was charged for it – I'm gonna tell you how it happened.
> I go pick up – they impound my truck.  So me and my aunt – me
> and my aunt is calling, like, when can I come pick up my truck?
> I know there's nothing in it.  I honest to God know there's
> nothing in my truck.  I know there's nothing in there that I put in
> there.
>
> So three days – I think it was four days later on a Tuesday they
> said you can come get your truck around 1:00.  I needed my
> truck.  So I go in there, and the officer's, like, you got your keys?
> I'm like, no.  You took my keys.  Y'all took my keys when y'all
> pulled me over.
>
> So I get through the door thinking I'm gonna get my truck, and
> they say you have a warrant.  So I knew I had some traffic tickets,
> so I'm thinking the warrant is for a traffic ticket.  I'm like, oh,
> man, it's these traffic tickets.
>
> . . .

> Then he said we found six bags of heroin in your truck.  I said, you ain't find – that's when I had – that's when I had, you know, snapped.  And Officer Sollenberger out of the Carlisle Police Force he said I know you.  He said, I don't believe them drugs are your drugs, you know what I mean.[30]

Despite Petitioner's efforts to testify in his own defense, he was convicted and subsequently sentenced on November 5, 2013.[31]

On November 15, 2013, Petitioner's counsel filed a post-sentence motion, which was denied by the trial court on November 19, 2013.[32]  Petitioner then filed a *pro se* motion under the Pennsylvania Post Conviction Relief Act ("PCRA"), which was also denied by the trial court on November 19, 2013, as premature.[33]

A timely notice of appeal was filed on December 12, 2013.[34]  On December 18, 2014, the Superior Court of Pennsylvania affirmed Petitioner's conviction and sentence.[35]  Petitioner never filed a petition for allowance of appeal with the Supreme Court of Pennsylvania.[36]

Two months later, on February 27, 2015, Petitioner filed his second PCRA petition.[37]  Following a hearing and briefing by both parties, the trial court denied

---

[30]  *Id.* at 191-92.
[31]  Doc. 11-1.
[32]  *Id.*
[33]  *Id.*
[34]  *Id.* at 3-4.
[35]  *Id.* at 4.
[36]  *Id.*
[37]  *Id.*

the second PCRA petition on October 30, 2015.[38]  This denial was appealed to the Superior Court, which affirmed it on February 7, 2017.[39]  Petitioner did not seek to appeal the affirmance to the Supreme Court of Pennsylvania.[40]

On September 13, 2017, Petitioner filed a third PCRA petition.[41]  The trial court issued an order noticing its intent to dismiss the third PCRA petition as untimely, which, after a response by Petitioner, it proceeded to do on October 30, 2017.[42]  Petitioner did not file any appeals related to that dismissal, and the time for filing an appeal to the Superior Court expired on or about November 29, 2017.[43]

Petitioner filed the instant petition for writ of habeas corpus on October 16, 2018, arguing in grounds 1 and 2 that the trial court should have granted his motion for preservation of evidence regarding dash camera footage, which would be exculpatory and demonstrate that he could not have tossed a bag under the seat while he was driving; in ground 3 that his trial counsel was ineffective regarding an unfiled motion to suppress evidence and other trial issues; and in ground 4 that there was never a valid warrant for Petitioner when he was initially arrested; that three days after he was arrested drugs were discovered in Petitioner's vehicle, which were not his drugs, and that the lead detective on his case and who obtained the search warrant

---

[38]  *Id.*
[39]  *Id.*
[40]  *Id.*
[41]  *Id.*
[42]  *Id.*
[43]  *Id.  See* Pa. R. App. P. 903 (providing thirty days in which to file a direct appeal).

for his vehicle, Christopher Collare, is under federal investigation regarding malfeasance while employed by the Carlisle Police Department.  Petitioner states that this "new evidence" warrants a new trial.

Indeed, former detective Christopher Collare was present at Petitioner's traffic stop and search, obtained the search warrant for Petitioner's vehicle, searched the vehicle, and discovered the drugs inside a knit glove, was since charged federally with wire fraud, honest services fraud, bribery, distribution of heroin, and false statements in this Court.[44]  Specifically,

> On January 16, 2020, a grand jury indicted Collare for sixteen counts of wire fraud under 18 U.S.C. §§ 1343 and 1349 (Counts 1–16); four counts of honest services mail fraud under 18 U.S.C. §§ 1341, 1346, and 1349 (Counts 17–20); one count of federal program bribery under 18 U.S.C. § 666(a)(1)(B) (Count 21); one count of public official bribery under 18 U.S.C. § 201(b)(2) (Count 22); one count of distribution of heroin under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846 (Count 23); and six counts of making a false statement under 18 U.S.C. § 1001(a)(2) (Counts 24–29).

> According to the facts alleged in the indictment, Collare was an officer with the CPD from 1996 to 2018 and served as a member of the Cumberland County Drug Task Force ("CCDTF") from 2011 to 2018. During that time, Collare served as a member of the FBI's Capital City Safe Streets Task Force in Harrisburg, Pennsylvania.  In performing his work for the CPD and the two task forces, Collare recruited and enlisted confidential informants to assist with drug investigations and supervised the confidential informants' participation in controlled buys of narcotics.

---

[44]   *See United States v. Collare*, No. 20-cr-17 (M.D. Pa.).  The undersigned is not presiding over Mr. Collare's federal criminal proceedings, which are assigned to a judicial officer in a separate vicinage of this Court.

Counts 1–16 of the indictment allege that Collare "knowingly devised, intended to devise, and participated in a scheme and artifice to defraud the Borough of Carlisle and the CCDTF, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises." The indictment alleges that as part of this scheme, Collare recruited confidential informants, materially falsified information on forms associated with controlled buys, provided drugs to confidential informants for the purpose of developing sexual relationships with female confidential informants, and allowed confidential informants to retain drugs they obtained through controlled buys for the same purpose. The indictment provides dates on which Collare allegedly recruited certain confidential informants and on which he allegedly falsified documents related to those confidential informants. The indictment then alleges that in furtherance of his scheme, Collare "caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds." Specifically, the indictment alleges that Collare conducted sixteen searches through the Pennsylvania Justice Network ("JNET") to obtain information about confidential informants and about targets of drug investigations.

Counts 17–20 of the indictment allege that Collare "knowingly devised, intended to devise, and participated in a scheme and artifice to defraud and deprive the Borough of Carlisle and its citizens of their intangible right to the honest services of Collare through bribery." The indictment alleges that Collare used his official position as an officer with the CPD to obtain sexual favors from two individuals identified as Person #16 and Person #7 by agreeing to take certain actions in criminal prosecutions against the individuals' boyfriends, who are identified as Person #17 and Person #18.

The indictment provides specific factual details that are relevant to the charges in Counts 17–20. According to the indictment, Collare first met Person #16 after she posted an online advertisement seeking money in exchange for sex, at which point Collare picked up Person #16 in his car and she had sexual intercourse with him in exchange for money. Collare subsequently provided money and heroin to Person #16 in exchange for sexual intercourse on multiple occasions between December 2011 and August 2014.

In August 2014, Collare and other officers searched the home of Person #17, who was Person #16's boyfriend during the time relevant to the indictment, and seized controlled substances, including heroin. Collare arrested Person #17, and Person #17 was then charged with one count of the manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance in the Court of Common Pleas of Cumberland County. The maximum fine for such a charge under Pennsylvania law was $250,000. While Person #17's charge was pending, Person #16 offered Collare sexual intercourse or money in exchange for Collare's promise to not appear as a witness in Person #17's then-upcoming suppression hearing so that the charge against Person #17 would be dismissed. Collare accepted the offer and had sexual intercourse with Person #16. Person #16 then asked Collare to confirm their agreement in August 2015 and Collare confirmed that in exchange for sexual intercourse, he would not appear for Person #17's suppression hearing, at which point the individuals had sexual intercourse. Person #17's suppression hearing subsequently occurred, after which the judge presiding over Person #17's criminal case issued an order suppressing the evidence that was seized from Person #17's home. The charge against Person #17 was then dismissed on the same day.

Collare's alleged actions with respect to the other pair of individuals—Person #7 and Person #18—began on December 2, 2017, when Collare arrested Person #18. As a result of the arrest, Person #18 was charged with delivering narcotics and unlawful gun possession. Collare enlisted Person #7, who was Person #18's girlfriend at all relevant times, as a confidential informant in January 2018. In March 2018, Collare told Person #7 that if she "helped" Collare, he would take steps to reduce Person #18's potential sentence. Collare then "undid his pants, exposed his penis, and placed Person #7's hand on his penis." At this point, Person #7 asked Collare about Person #18's potential sentence and Collare told her that Person #18 would receive a sentence of time served and be allowed to return home. Person #7 then performed oral sex on Collare. Person #18 subsequently pleaded guilty to one count of unlawful delivery of narcotics and was sentenced to twenty-four months in the state intermediate punishment program.

Counts 17–20 allege that in furtherance of his scheme to deprive the Borough of Carlisle of his honest services, Collare "knowingly caused

to be deposited in a post office and authorized depository for mail to be delivered by the Postal Service" four court documents in violation of 18 U.S.C. §§ 1341, 1346, and 1349.

Count 21 alleges that Collare accepted a bribe in violation of 18 U.S.C. § 666(a)(1)(B) by accepting sex and sexual favors while "intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the Borough of Carlisle and Cumberland County, Pennsylvania valued at $5,000 or more."  Count 22 similarly alleges that Collare accepted a bribe in violation of 18 U.S.C. § 201(b)(2) by accepting sex and sexual favors in exchange for "being influenced in the performance of an official act, and being induced to do and omit to do any act in violation of his duties."[45]

This matter is presently set for trial on July 6, 2021.[46]

Respondents generally argue that Petitioner has failed to exhaust his administrative remedies as to his claims and that his petition is untimely.[47]  They also briefly address the merits of Petitioner's claims but do not directly address the investigation and indictment of Mr. Collare.

Petitioner filed a letter update with the Court after he learned of the federal charges against Mr. Collare, which were not known at the time he filed the petition. He states that the criminal charges against Mr. Collare are the evidence that he has been waiting for to prove his innocence, reiterates that the drugs were planted in his car by Mr. Collare, alleges that Mr. Collare took advantage of a girl he used to date,

---

[45] *Id.*, Doc. 38 at 1-6 (memorandum regarding motion to dismiss charges) (internal citations omitted).

[46] *Id.*, Doc. 60 (scheduling order).

[47] Doc. 11-1.

and that he has no reason to lie.[48]   Respondents have not filed any reply to Petitioner's update.

## II.   DISCUSSION

A state prisoner applying for a § 2254 writ of habeas corpus in federal court must first "exhaust[ ] the remedies available in the courts of the State" unless "there is an absence of available State corrective process[ ] or . . . circumstances exist that render such process ineffective."[49]   A petitioner must exhaust state remedies by presenting his federal constitutional claims to each level of the state courts empowered to hear those claims, either on direct appeal or in post-conviction proceedings.[50]  This statutory exhaustion requirement promotes comity and reflects the fundamental idea that the state should be given the initial opportunity to review and correct alleged violations of a petitioner's constitutional rights.[51]   In addition, requiring the exhaustion of claims in state court promotes the important goal of

---

[48]   Doc. 16.

[49]   28 U.S.C. § 2254(b)(1).  *See Rose v. Lundy*, 455 U.S. 509, 515 (1982); *Toulson v. Beyer*, 987 F.2d 984, 987 (3d Cir. 1993); *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir.1997) (2001) (finding that "Supreme Court precedent and the AEDPA mandate that prior to determining the merits of [a] petition, [a court] must consider whether [petitioner] is required to present [his or her] unexhausted claims to the [state's] courts").

[50]   *See Ross v. Petsock*, 868 F.2d 639 (3d Cir. 1989); *see also O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) ("requiring state prisoners [in order to fully exhaust their claims] to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"); 28 U.S.C. § 2254(c) ("[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented").

[51]   *See O'Sullivan*, 526 U.S. at 844.

ensuring that a factual record is developed to aid the federal courts in their review of a § 2254 petition.[52]

Only if a petitioner's federal claims have been fairly presented to each level of the state court, including the state's highest court, is the exhaustion requirement satisfied.[53]  As a result, district courts should generally dismiss petitions containing unexhausted claims in the absence of a state court decision precluding further relief, even if it is not likely that a state court will consider the claims on the merits.[54]

In *Rhines v. Weber,*[55] however, the Supreme Court held that a district court has the authority to stay a § 2254 petition when a stay would be compatible with the Antiterrorism Effective Death Penalty Act's ("AEDPA") purposes,[56] and that "it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.  In such circumstances, the district court should stay, rather than dismiss, the mixed petition."[57]  The *Rhines* Court explained:

---

[52]  *See Walker v. Vaughn*, 53 F.3d 609, 614 (3d Cir.1995).
[53]  *See Picard*, 404 U.S. at 275; *Castille*, 489 U.S. at 350.
[54]  *See Rose*, 455 U.S. at 522; *Banks v. Horn*, 126 F.3d 206, 212–14 (3d Cir.1997); *see also Toulson*, 987 F.2d at 989.
[55]  544 U.S. 269 (2005)
[56]  *Id.* at 276
[57]  *Id.* at 278.  *See also Heleva v. Brooks*, 581 F.3d 187 (3d Cir. 2009) (holding that stay-and-abeyance under *Rhines* also applies to a petition which contains only unexhausted claims).

> If a petitioner files a timely but mixed petition in federal district court, and the district court dismisses it under [*Rose v. Lundy*] after the limitations period has expired, this will likely mean the termination of any federal review.  For example, if the District Court in this case had dismissed the petition because it contained unexhausted claims, AEDPA's 1-year statute of limitations would have barred Rhines from returning to federal court after exhausting the previously unexhausted claims in state court.[58]

A district court may consider and issue a stay *sua sponte* when appropriate.[59]

It appears that Petitioner has not exhausted any of his grounds for relief as he has never completed one full round of Pennsylvania's state court process.[60]  The Court, however, finds it appropriate to *sua sponte* consider whether a stay of this petition is appropriate under *Rhines* in light of the grounds for relief raised by Petitioner, who is proceeding *pro se*, and the pending criminal proceedings against Mr. Collare.

Specifically, although Mr. Collare is entitled to the presumption of innocence, the charges and factual allegations against him are serious and may undermine Petitioner's conviction as the conduct alleged in the indictment occurred in or around Carlisle Borough in Cumberland County between 2011 and 2018 and Mr. Collare provided important testimony at Petitioner's trial.  Petitioner's claim, especially

---

[58]  *Rhines*, 544 U.S. at 275.

[59]  *See*, *e.g.*, *Winters v. Burns*, No. 13-cv-3828, 2013 WL 5761314 (E.D. Pa. Oct. 21, 2013); *Abbott v. Pa. Dep't of Corrs.*, No. 06-cv-1451, 2007 WL 1892597, at *4 (W.D. Pa. June 28, 2007) (considering *sua sponte* the appropriateness of a *Rhines* stay and abey in light of petitioner's *pro se* status).

[60]  The Court notes that Petitioner's first three grounds for relief are also likely time barred.

when coupled with his decision to testify at trial that the heroin found in his vehicle was not his and the strong implication that it was planted by Mr. Collare, could be "potentially meritorious."  Similarly, it is only recently that the criminal charges were filed against Mr. Collare, and Petitioner filed this petition after learning of the investigation.  Thus, Petitioner has acted diligently, and there is no indication that he has engaged in dilatoriness.  Finally, Petitioner would not have been in a position to learn of the charges against Mr. Collare at an earlier time, and consequently able to exhaust this issue in his previous PCRA petitions.  The Collare investigation was, of course, confidential and the indictment filed under seal.

It is especially appropriate in this instance for the Pennsylvania state courts to consider this issue because, as this Court notes, many prosecutor's offices have created conviction integrity units to examine convictions in light of later allegations like those presented here; further PCRA proceedings may develop the factual record as to the issues raised by Petitioner regarding Mr. Collare.[61]

I emphasize that this is not to say that anything untoward or unconstitutional occurred here, simply that it is appropriate for the state courts to be provided the first opportunity to review this claim in light of the pending criminal proceeding against

---

[61]   The Court takes judicial notice of a newspaper article in which Cumberland County's District Attorney advised that he was dropping criminal charges in dozens of cases involving Mr. Collare in light of his indictment, and that those cases previously adjudicated between 2011 and 2018 may come under review.  *See* "Cases Dropped Following Arrest of Former Cumberland County Detective: Report," *The Patriot-News* (Jan. 27, 2020).

Mr. Collare.  For these reasons, the Court will stay and abey the petition while Petitioner raises and exhausts his grounds for relief in the Pennsylvania state courts.

## IV.    CONCLUSION

For the reasons set forth above, this Court finds that the § 2254 habeas petition should be stayed *sua sponte* pending Petitioner's exhaustion of his grounds for relief in state court.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge